CLERK, U.S. DISTRICT COURT

9/18/17

CENTRAL DISTRICT OF CALIFORNIA
BY: CS _____ DEPUTY

1 DAVID SHONKA
2 ACTING GENERAL COUNSEL

3 JOANNIE WEI
   SAMUEL LEVINE
4 AUDREY AUSTIN
5 jwei@ftc.gov
   slevine1@ftc.gov
6 aaustin2@ftc.gov
7 Federal Trade Commission
   230 South Dearborn Street, Room 3030
8 Chicago, Illinois 60604
9 Tel: (312) 960-5634; Fax: (312) 960-5600

10 BARBARA CHUN, Local Counsel (Cal. Bar No.186907)
11 bchun@ftc.gov
12 Federal Trade Commission
   10990 Wilshire Boulevard, Suite 400
13 Los Angeles, California 90024
14 Tel: (310) 824-4343; Fax: (310) 824-4380

15 Attorneys for Plaintiff
16 FEDERAL TRADE COMMISSION

17
18

| | FILED |
|---|---|
| | CLERK, U.S. DISTRICT COURT |
| | 09/18/2017 |
| | CENTRAL DISTRICT OF CALIFORNIA |
| | BY _____ DEPUTY |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

19
20 FEDERAL TRADE COMMISSION,
21                 Plaintiff,
22          v.
23 M&T FINANCIAL GROUP, a
24 corporation, also d/b/a StuDebt, Student
25 Debt Relief Group, SDRG, Student
26 Loan Relief Counselors, SLRC, and
   Capital Advocates Group,
27
28 AMERICAN COUNSELING CENTER

Case No. ___CV17-6855-ODW(PLAx)___

Complaint for Permanent Injunction
and Other Equitable Relief

CORP., a corporation, also d/b/a
StuDebt, Student Debt Relief Group,
SDRG, Student Loan Relief Counselors,
SLRC, and Capital Advocates Group,
and

SALAR TAHOUR, individually, and as
an officer of M&T FINANCIAL
GROUP and AMERICAN
COUNSELING CENTER CORP.,

      Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a), 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, in connection with their deceptive marketing and sale of student loan debt relief services.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), and 6102(c).

3.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), and 6102(c).

## DEFENDANTS

6.      Defendant M&T Financial Group ("M&T Financial"), also doing business as StuDebt, Student Debt Relief Group, SDRG, Student Loan Relief Counselors, SLRC, and Capital Advocates Group, is a California corporation with its registered address at 11766 Wilshire Boulevard, Suite 310, Los Angeles, California 90025. M&T Financial transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, M&T Finanical has advertised, marketed, distributed, or sold student loan debt relief services to consumers throughout the United States.

7.      Defendant American Counseling Center Corp. ("American Counseling"), also doing business as StuDebt, Student Debt Relief Group, SDRG, Student Loan Relief Counselors, SLRC, and Capital Advocates Group, is a

California corporation with its registered address at 11766 Wilshire Boulevard, Suite 310, Los Angeles, California 90025. American Counseling transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, American Counseling has advertised, marketed, distributed, or sold student loan debt relief services to consumers throughout the United States.

8.     Defendant Salar Tahour is the sole owner and a manager of M&T Financial and American Counseling. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of M&T Financial and American Counseling, including the acts and practices set forth in this Complaint. For example, Tahour registered and paid for phone numbers and domain names and is the sole signatory on the bank accounts and merchant processing accounts for M&T Financial. In addition, Tahour personally responded to complaints filed about the companies with the California Attorney General's Office and the Better Business Bureau. Defendant Tahour resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

9.     Defendants M&T Financial and American Counseling (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below. Defendants have conducted the business practices described below through interrelated companies, which have common ownership, officers, managers, business functions, and office locations, and which share fictitious business names, SLRC and SDRG. Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendant Tahour has formulated, directed, controlled,

had the authority to control, or participated in the acts and practices of the

Corporate Defendants that constitute the common enterprise.

## COMMERCE

10.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' DECEPTIVE
## STUDENT LOAN DEBT RELIEF OPERATION

11.    Since 2014, Defendants have operated an unlawful debt relief enterprise to bilk consumers out of millions of dollars.  Preying on widespread anxiety and confusion around student debt, Defendants misrepresent the cost and features of federal student loan repayment programs in order to extract fees from the struggling consumers these programs are designed to help.  After reaching consumers through an aggressive outbound telemarketing campaign that includes illegal calls to consumers on the National Do Not Call Registry, Defendants work to gain consumers' trust by falsely claiming they work for or are affiliated with the U.S. Department of Education ("ED").  Defendants then entice consumers with false promises that they qualify for federal programs that would permanently reduce their monthly loan payments to a fixed amount.  To access these free government programs, Defendants tell consumers that they must pay an advance fee of up to $1047.  In addition to these illegal advance fees, Defendants also collect and retain monthly fees that consumers believe are being applied to pay down their loans.  Finally, Defendants also instruct consumers to ignore future communications with their loan servicers and ED, and to communicate only with Defendants, who many consumers believe will now be servicing their loans.

### Background on Student Loan Repayment and Forgiveness Programs

12.     Student loan debt is the second largest class of consumer debt; more than 42 million Americans collectively owe more than $1.3 trillion on student loans.  The student loan market continues to show elevated levels of distress relative to other types of consumer debt.

13.     To address this mounting level of distressed debt, the federal government offers loan forgiveness through income-driven repayment ("IDR") programs that enable borrowers to reduce their monthly payments and have portions of their loans forgiven.  IDR programs allow eligible borrowers to limit their monthly payments based on a percentage of their discretionary monthly income.  To remain in an IDR program, borrowers must recertify their income and family size annually.  Obtaining forgiveness through IDR programs requires a minimum of 20 or 25 years of qualifying payments.  No loans have been forgiven yet under any of the IDR programs.

14.     Because a borrower's income is likely to fluctuate over the life of the loan, monthly payments under the IDR programs can vary considerably from year to year.  If a borrower's income were to increase over the repayment period, for example, the monthly payment amount could correspondingly increase to the point where those payments would pay off the loan before any amount could be forgiven at the end of the repayment term.

15.     ED and state government agencies also administer a limited number of student loan forgiveness and discharge programs.  Most consumers, however, are not eligible for these programs because of strict eligibility requirements.  For example, Public Service Loan Forgiveness applies to employees of governmental units or non-profit organizations who make timely monthly payments for a period of ten years while employed in the public or non-profit sector.

16.   Consumers can apply for loan repayment and forgiveness programs through ED or their student loan servicers at no cost; these programs do not require the assistance of a third party or the payment of any fees.

17.   ED will grant forbearance while processing applications for an alternative repayment plan, and in some cases of hardship.  During forbearance, unpaid interest is added to the principal balance.

18.   ED also allows consumers with multiple federal loans to consolidate them into one "Direct Consolidation Loan" with a fixed interest rate and single monthly payment.  ED does not charge for consolidation and offers a dedicated helpline and webpage to assist borrowers with the process.

**Defendants' Deceptive Marketing of Student Loan Debt Relief Services**

19.   Defendants typically first contact consumers via outbound telemarketing calls, including calls to consumers who have registered their telephone numbers on the National Do Not Call Registry.  In many instances, Defendants already are aware that the consumers they are contacting have outstanding student loans.  Many consumers who receive the calls do not know how Defendants obtained their telephone numbers and how they knew that the consumers had outstanding student loans.

20.   During the telemarketing calls, Defendants often lead consumers to believe that they are affiliated with ED and that they work directly with ED to enroll consumers in ED programs that will lower their monthly payments.  For example, Defendants have told some consumers that they "work on behalf of the government," are a "partner of ED," or "represent ED in assisting students."  To further the misimpression that they are affiliated with the U.S. government, Defendants also use email addresses that end in ".us."

21.   During the telemarketing calls, Defendants inform consumers that they are eligible, or "preapproved," for a government "forgiveness" program that would significantly reduce consumers' current monthly student loan payments,

often by hundreds of dollars each month.  In some instances, Defendants make this promise about lowering consumers' monthly payments without even asking about consumers' monthly income.

22.    Defendants typically tell consumers that their new, lower monthly payment amount will be their payment amount for the next 10 or 20 years, and that thereafter, the consumers' remaining loan balances will be forgiven.  Defendants also sometimes promise consumers that they will save a specific amount of money, usually in the thousands of dollars, by enrolling in the program Defendants describe.

23.    Defendants' representations that they are able to procure a permanent reduction in consumers' monthly payments are false or unsubstantiated because none of ED's IDR programs guarantees consumers a fixed, reduced monthly payment for more than one year.  Under ED's IDR programs, monthly payments fluctuate based on consumers' income in a given year, which consumers must recertify annually, and the amount forgiven depends on what remains unpaid at the end of the repayment period.  In many cases, consumers' income will rise over the years-long repayment period, and as consumers' income rises, so will their monthly payment in a given year.  As a result, the amount that would be forgiven at the end of the repayment term typically would be less than Defendants have promised.

24.    If consumers are initially unwilling to work with Defendants, Defendants often attempt to convince them to do so by telling consumers that the federal programs were created by then-President Obama under the "Student Loan Forgiveness Act of 2012" (a proposal never signed into law), and that these programs will, or likely will, be eliminated soon.  In Defendants' subsequent emails to consumers requesting personal and financial information, Defendants also pressure consumers to act quickly by stating, for example, that matters are

1  "time-sensitive," and that failure to provide Defendants with the requested
2  information could result in "dropped enrollment" from the program.

3  ### Defendants' Advance and Monthly Fees

4      25.    After persuading consumers to work with Defendants to permanently
5  lower their monthly student loan payments, Defendants' telemarketers typically
6  tell consumers that to enroll in the federal program, consumers are required to pay
7  an advance fee, which Defendants call an "enrollment," "processing," or
8  "application" fee. Defendants represent that if consumers do not pay the advance
9  fee, they will not be able to enroll in the program. The fee Defendants charge
10 consumers typically ranges from $398 to $1047 and is collected in three
11 installments.   In fact, none of ED's programs requires an advance fee, or any fee,
12 to apply. Consumers can apply for ED's programs on their own, at no cost.
13 Defendants' telemarketers typically obtain consumers' bank, debit or other
14 payment information during the initial telemarketing call, and begin collecting the
15 advance fee installments from consumers immediately. Defendants routinely
16 charge consumers advance fees before enrolling consumers in any federal program.

17     26.    In addition to charging an advance fee, Defendants also frequently
18 charge consumers a monthly fee, which typically is $39. Defendants falsely
19 represent that this amount will be the consumer's new, reduced monthly loan
20 payment. Defendants collect and retain these monthly fees, however—they do not
21 apply the monthly fees to pay down consumers' loans, as consumers are led to
22 believe.

23     27.    In numerous instances, Defendants have charged this type of monthly
24 fee to unemployed and otherwise financially strapped consumers who likely would
25 qualify for a $0 monthly payment under an IDR program. In those instances,
26 Defendants retain the entire monthly fee and do not use any portion of the fee to
27 pay down consumers' outstanding loan balances. Some consumers have paid
28

Defendants hundreds of dollars in monthly fees they can ill afford before discovering that none of those fees were applied to pay down their student loans.

### Defendants' Contracts

28.     Once Defendants have convinced consumers to enroll in the program and turn over their payment information, Defendants typically email consumers a link to a lengthy form contract that consumers are required to sign electronically. As consumers remain on the phone, Defendants pressure them to click through the document and electronically sign multiple pages, including a power of attorney form. In some instances, Defendants represent that consumers do not need to read the agreement carefully because the information contained in the contract was already discussed in the telemarketing call.

29.     In fact, Defendants' contract typically contains information that was not discussed with consumers or that directly contradicts statements made to consumers during the telemarketing call. For example, although Defendants represent in the telemarketing calls that they are affiliated with ED, the form contract states that Defendants, in fact, are not affiliated with ED.

30.     Similarly, although Defendants represent in the telemarketing calls that the $39 monthly fee will be used to pay down consumers' loans, the contracts typically state that these fees will be used to pay for unrelated products or services that were never discussed in the telemarketing call, such as "Involuntary Unemployment Insurance," "Auto Buying Service and Maintenance," or "tax preparation." This statement often is buried in the middle of the contract, in dense text listing various other terms and conditions.

### Cutting Off Consumers' Communication with Servicers and ED

31.     In many instances, Defendants falsely represent that they will be the new servicer of consumers' student loans under the touted federal program. Defendants tell consumers to stop communicating with, and disregard correspondence from, their current loan servicers and ED. Instead, Defendants

instruct consumers to direct all questions and concerns to Defendants, often delaying or preventing consumers from discovering that they can work on their own or with their actual servicer to modify their loan terms for free.  In some instances, Defendants even tell consumers that communicating with their servicers could jeopardize the consumer's application for the federal program.

32.    Defendants also often ask consumers to provide their Federal Student Aid credentials that are required to access their loan information in the federal government's database.  Once Defendants have access to consumers' loan account, they often change consumers' username, password, security question, or contact information.  As a result, many consumers stop receiving correspondence from their loan servicers and from ED and temporarily lose access to their own loan information.

33.    Consumers often discover that they have been scammed only after talking to their actual loan servicer and realizing that Defendants charged them hundreds of dollars to enroll in a program that they could have enrolled in by themselves, for free.

34.    In some instances, Defendants even take actions that may be detrimental to consumers' ability to repay their loans.  For example, Defendants routinely consolidate consumers' loans even though under certain ED  forgiveness programs, this could cause borrowers to lose credit for payments already made and thereby delay their ability to obtain forgiveness.

35.    Some consumers who discover that they have been scammed cancel or block their accounts to prevent further charges by Defendants.  In some instances, these consumers receive threats from Defendants that consumers' accounts will be sent to collections and that their credit scores will be negatively affected.

36.    In numerous instances, Defendants have refused to provide refunds to consumers who request them after learning that Defendants had scammed them.  In

some instances, Defendants have provided only partial refunds that are substantially less than what consumers paid to Defendants.

### Defendants' Unlawful Calls to Consumers
### n the National Do Not Call Registry

37.     Defendants frequently place outbound telemarketing calls to consumers who have registered their telephone numbers on the National Do Not Call Registry.

38.     Defendants have placed such calls to area codes without paying the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry.

39.     Dozens of consumers have complained to the FTC and BBB about receiving unwanted outbound calls from Defendants in spite of having registered with the National Do Not Call Registry.

### THE FTC ACT

40.     Section 5(a) of the FTC Act, 15 U.S.C. §45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

41.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### VIOLATIONS OF THE FTC ACT
### Count I
### Deceptive Student Loan Debt Relief Representations

42.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants represent, directly or indirectly, expressly or by implication, that:

        a.     Defendants are affiliated or work directly with the government or the Department of Education;

b.    Defendants will enroll consumers in a student loan repayment or forgiveness program that will have their monthly payments reduced to a fixed amount for a fixed number of years;

c.    The government repayment or forgiveness program requires consumers to pay a fee to enroll;

d.    Consumers' monthly payments to Defendants will be applied toward consumers' student loans; and

e.    Defendants will assume responsibility for the servicing of consumers' student loans.

43.    In truth and in fact, in numerous instances in which Defendants make the representations set forth in Paragraph 42 of this Complaint, such representations are false or not substantiated at the time Defendants make them.

44.    Therefore, Defendants' representations as set forth in Paragraph 42 of this Complaint are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

45.    Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

46.    Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), (gg).  A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration.  16 C.F.R. § 310.2(dd). A "telemarketer" means any person who, in connection with telemarketing, initiates or receives

telephone calls to or from a customer or donor.  16 C.F.R. § 310.2(ff).

"Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call.  16 C.F.R. § 310.2(gg).

47.   Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o).  Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.  16 C.F.R. § 310.2(o).

48.   The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

   a.   The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

   b.   The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor; and

   c.   To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

      i.   Bears the same proportional relationship to the total fee for renegotiating, settling, reducing or altering the terms of the entire debt balance as the individual debt amount bears to the

entire debt amount.  The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

    ii.    Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.  The percentage charged cannot change from one individual debt to another.  The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.  16 C.F.R. § 310.4(a)(5)(i).

49.    The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication a seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity. 16 C.F.R. § 310.3(a)(2)(vii).

50.    The TSR prohibits sellers and telemarketers from misrepresenting directly or by implication, any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service.  16 C.F.R. § 310.3(a)(2) (x).

51.    The TSR prohibits sellers and telemarketers from initiating or causing others to initiate outbound telephone calls to consumers who have registered their telephone numbers on the National Do Not Call Registry.  16 C.F.R. § 310.4(b)(1)(iii)(B).

52.    The FTC allows sellers, telemarketers, and other permitted organizations to access the National Do Not Call Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required by the TSR, and to download a list of numbers that are prohibited from being called.

53.    The TSR prohibits sellers and telemarketers from calling any telephone number within a given area code unless the seller on whose behalf the

1  call is made has paid the annual fee for access to the telephone numbers within that

2  area code that are included in the National Do Not Call Registry.  16 C.F.R. §

3  310.8.

4         54.    Consumers who receive telemarketing calls to their registered

5  numbers can complain of National Do Not Call Registry violations the same way

6  they registered, through a toll-free telephone call or over the Internet at

7  donotcall.gov, or by otherwise contacting law enforcement authorities.

8         55.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. §

9  6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of

10  the TSR constitutes an unfair or deceptive act or practice in or affecting commerce,

11  in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

12

13            **VIOLATIONS OF THE TELEMARKETING SALES RULE**

14                              **Count II**

15                **Advance Fee for Debt Relief Services**

16         56.    In numerous instances, in connection with the telemarketing of

17  student loan debt relief services, Defendants request or receive payment of a fee or

18  consideration for debt relief services before:

19            a.     Defendants have renegotiated, settled, reduced, or otherwise

20                  altered the terms of at least one debt pursuant to a settlement

21                  agreement, debt management plan, or other such valid contractual

22                  agreement executed by the customer; and

23            b.     The customer has made at least one payment pursuant to that

24                  settlement agreement, debt management plan, or other valid

25                  contractual agreement between the customer and the creditor.

26         57.    Defendants' acts or practices, as described in Paragraph 56 of this

27  Complaint, are abusive telemarketing acts or practices that violate Section

28  310.4(a)(5)(i) of the TSR, 16 C.F.R. §310.4(a)(5)(i).

## Count III

## Misrepresentation of Affiliation

58.    In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants misrepresent, directly or indirectly, expressly or by implication, that Defendants are affiliated with, or endorsed or sponsored by, the government or the Department of Education.

59.    Defendants' acts and practices, as described in Paragraph 58 of this Complaint, are deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(vii) of the TSR, 16 C.F.R. § 310.3(a)(2)(vii).

## Count IV

## Material Debt Relief Misrepresentations

60.    In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants misrepresent, directly or indirectly, expressly or by implication, material aspects of their debt relief services, including that:

    a.  Defendants will enroll consumers in a student loan repayment or forgiveness program that will reduce their monthly payments to a fixed amount for a fixed number of years;

    b.  The government repayment or forgiveness program requires consumers to pay a fee to enroll;

    c.  Consumers' monthly payments to Defendants will be applied toward consumers' student loans; and

    d.  Defendants will assume responsibility for the servicing of consumers' student loans.

61.    Defendants' acts and practices, as described in Paragraph 60 of this Complaint, are deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

ewBottom

## Count V

## Calls in Violation of National Do Not Call Registry

62.     In connection with telemarketing, Defendants initiated or caused others to initiate numerous outbound telephone calls to consumers who have registered their telephone numbers on the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## Count VI

## Failure to Pay Required Fee for Access

## to National Do Not Call Registry

63.     In connection with telemarketing, Defendants initiated or caused others to initiate numerous outbound telephone calls to telephone numbers within a given area code when Defendants had not, either directly or through another person, paid the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry in violation of the TSR, 16 C.F.R. § 310.8.


## <u>CONSUMER INJURY</u>

64.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.


## <u>THIS COURT'S POWER TO GRANT RELIEF</u>

65.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including

1  rescission or reformation of contracts, restitution, the refund of monies paid, and

2  the disgorgement of ill-gotten monies, to prevent and remedy any violation of any

3  provision of law enforced by the FTC.

4       66.    Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b),

5  authorizes this Court to grant such relief as the Court finds necessary to redress

6  injury to consumers resulting from Defendants' violations of the TSR, including

7  the rescission or reformation of contracts, and the refund of money.

8

9  **PRAYER FOR RELIEF**

10  Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15

11  U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

12      A.    Award Plaintiff such preliminary injunctive and ancillary relief as

13  may be necessary to avert the likelihood of consumer injury during the pendency

14  of this action and to preserve the possibility of effective final relief, including but

15  not limited to, a temporary and preliminary injunction, asset freeze, appointment of

16  a receiver, an evidence preservation order, and expedited discovery;

17      B.    Enter a permanent injunction to prevent future violations of the FTC

18  Act and the TSR;

19      C.    Award such relief as the Court finds necessary to redress injury to

20  consumers resulting from Defendants' violations of the FTC Act and the TSR,

21  including but not limited to, rescission or reformation of contracts, restitution, the

22  refund of monies paid, and the disgorgement of ill-gotten monies; and

23      D.    Award Plaintiff the costs of bringing this action, as well as such other

24  and additional relief as the Court may determine to be just and proper.

25

26

27

28

1

2

3

4

5

6

7   Dated: September 18, 2017

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

David Shonka

Acting General Counsel

Joannie Wei, IL Bar #6276144
Samuel Levine, IL Bar #6309543
Audrey Austin, IL Bar #6307653
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION