LODGED
CLERK, U.S. DISTRICT COURT
9/18/17
CENTRAL DISTRICT OF CALIFORNIA
BY: CS DEPUTY

DAVID SHONKA
ACTING GENERAL COUNSEL

JOANNIE WEI
SAMUEL LEVINE
AUDREY AUSTIN
jwei@ftc.gov
slevine1@ftc.gov
aaustin2@ftc.gov
Federal Trade Commission
230 South Dearborn Street, Room 3030
Chicago, Illinois 60604
Tel: (312) 960-5634; Fax: (312) 960-5600

BARBARA CHUN, Local Counsel (Cal. Bar No.186907)
bchun@ftc.gov
Federal Trade Commission
10990 Wilshire Boulevard, Suite 400
Los Angeles, California 90024
Tel: (310) 824-4343; Fax: (310) 824-4380

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

FILED
CLERK, U.S. DISTRICT COURT
9/18/2017
CENTRAL DISTRICT OF CALIFORNIA
BY: ________________ DEPUTY

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

M&T FINANCIAL GROUP, a corporation, also d/b/a StuDebt, Student Debt Relief Group, SDRG, Student Loan Relief Counselors, SLRC, and Capital Advocates Group,

AMERICAN COUNSELING CENTER

Case No. CV17-6855-ODW(PLAx)

Memorandum in Support of Plaintiff's *Ex Parte* Application for Temporary Restraining Order with Asset Freeze, Appointment of a Receiver, Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue

CORP., a corporation, also d/b/a StuDebt, Student Debt Relief Group, SDRG, Student Loan Relief Counselors, SLRC, and Capital Advocates Group, and

SALAR TAHOUR, individually, and as an officer of M&T FINANCIAL GROUP and AMERICAN COUNSELING CENTER CORP.,

Defendants.

## TABLE OF CONTENTS


I. Defendants' Deceptive Business Practices .......... 3

A. False Claims of Affiliation with ED .......... 3

B. False Claim of Fixed Monthly Loan Payments .......... 6

C. Illegal Advance Fees and Fraudulent Monthly Charges .......... 7

D. Defendants' High-Pressure Tactics .......... 9

E. Cutting Consumers Off from Servicers and the Department of Education and Falsely Claiming to be Consumers' Servicer .......... 12

II. Defendants .......... 14

III. Argument .......... 15

A. This Court Has the Authority to Grant the Requested Relief .......... 15

B. The FTC Meets the Standard for Granting a Government Agency's Request for Temporary Injunctive Relief .......... 16

1. The FTC is Likely to Succeed on the Merits .......... 16

a. Defendants are Violating the FTC Act .......... 16

b. Defendants are Violating the TSR .......... 18

c. The Corporate Defendants are Jointly and Severally Liable Because They Form a Common Enterprise .......... 19

d. Salar Tahour is Individually Liable for Injunctive and Monetary Relief .......... 20

2. The Equities Tip Decidedly in the FTC's Favor .......... 21

C. The Temporary Restraining Order Should Include an Asset Freeze, Temporary Receivership, and Other Ancillary Relief .......... 21

D. The Temporary Restraining Order Should Be Issued *Ex Parte* .......... 23

IV. Conclusion .......... 25

# TABLE OF AUTHORITIES

## REPORTED CASES

*Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d Cir. 1964) .......... 19

*FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1233 (9th Cir. 1999) .......... 16, 20, 21

*FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 573-74 (7th Cir. 1989) .......... 20

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1199 (9th Cir. 2006) .......... 16, 18

*FTC v. Gill*, 71 F. Supp. 2d 1030, 1043 (C.D. Cal. 1999) .......... 17

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112-13 (9th Cir. 1982) .......... 15

*FTC v. John Beck Amazing Profits, LLC*, 865 F.Supp.2d 1052, 1082 (C.D. Cal. 2012) .......... 19

*FTC v. Johnson*, 96 F. Supp. 3d 1110, 1139 (D. Nev. 2015) .......... 17

*FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994) .......... 15, 17

*FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) .......... 20

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000) .......... 19

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984) .......... 23

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346 (9th Cir. 1989)................16, 21

*In re Cliffdale Assocs.*, 103 F.T.C. 110, 165 (1984)................16

*In the Matter of McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994)................23

*Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)................22

*Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006)................24

*Resort CarRental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975)................17

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1106 (2d Cir. 1972)................22

*Simeon Mgmt. Corp. v. FTC*, 579 F.2d 1137, 1146 (9th Cir. 1978)................17

**UNREPORTED CASES**

*FTC v. BAM Financial, LLC*, 15-1672-JVS-DFM (C.D. Cal. Oct. 21, 2015)........15

*FTC v. Consumer Advocates Group Experts, LLC*, CV 12-04736 DDP (C.D. Cal. May 30, 2012)................15

*FTC v. Consumer Assistance, LLC*, CV-16-21528-FAM (S.D. Fla. Apr. 29, 2017) 1

*FTC v. Credit Bureau Center*, CV-17-00194-MFK (N.D. Ill. July 18, 2017)........23

*FTC v. Damian Kutzner*, CV-16-999-BRO (AFMx) (C.D. Cal. June 1, 2016)......15

*FTC v. Good Ebusiness, LLC*, CV-16-1048-ODW (JPRx) (C.D. Cal. Feb. 16, 2016)........ 1, 15

*FTC v. Lakhany*, No. SACV 12-00337-CJC(JPR) (C.D. Cal. Mar. 7, 2012)........ 15

*FTC v. Strategic Student Solutions LLC*, CV-17-80619-WPD (S.D. Fla. May 15, 2017)........ 1

*FTC v. Student Aid Center, Inc.*, CV-16-21843-FAM (S.D. Fla. May 23, 2016) .... 1

*FTC v. Telestar Consulting, Inc.*, CV-16-555-SJO (SSx) (C.D. Cal. Feb. 1, 2016)........ 15

**STATUTES**

16 C.F.R. § 310.2........ 18

16 C.F.R. § 310.3........ 19

16 C.F.R. § 310.4........ 18, 19

16 C.F.R. § 310.8........ 19

Fed. R. Civ. P. 65(b)........ 23

Federal Trade Commission Act 15 U.S.C. § 45(a)........ 16

Federal Trade Commission Act 15 U.S.C. § 53(b) ........ 15

The Federal Trade Commission asks this Court to halt Defendants' nationwide student loan debt relief scheme. Preying on widespread anxiety and confusion about student debt, Defendants deceive consumers into paying them hundreds of dollars to enroll in federal student loan repayment programs that otherwise are free. In this way, Defendants have defrauded financially distressed consumers out of more than $7.3 million since 2014.

Student loan debt is growing rapidly in America. It is now the second largest class of consumer debt; more than 42 million Americans collectively owe over $1.3 trillion. Unfortunately, this increase in student loan debt has been accompanied by a dramatic increase in scams that try to take advantage of consumers who are struggling to pay their student loan debts. Following the same model as scams involving the purported relief of mortgage or credit card debt, which proliferated during the economic downturn, student loan debt relief scams capitalize on consumers' financial distress and involve similar misrepresentations and advance fees. The FTC has brought a series of cases against scams like the one perpetrated by Defendants here,[1] but the problem persists.

Defendants' scheme involves making unsolicited calls to consumers with outstanding student loan debt, in which Defendants make a series of critical misrepresentations about student loan repayment. In placing these calls, Defendants also ignore their obligation to avoid calling consumers who have registered their numbers with the National Do Not Call Registry. During their telemarketing calls, Defendants first falsely claim an affiliation with the Department of Education ("ED") and then promise to permanently reduce

---

[1] *See, e.g., FTC v. Good Ebusiness, LLC*, CV-16-1048-ODW (JPRx) (C.D. Cal. Feb. 16, 2016); *FTC v. Consumer Assistance, LLC*, CV-16-21528-FAM (S.D. Fla. Apr. 29, 2017); *FTC v. Student Aid Center, Inc.*, CV-16-21843-FAM (S.D. Fla. May 23, 2016); *FTC v. Strategic Student Solutions LLC*, CV-17-80619-WPD (S.D. Fla. May 15, 2017).

consumers' student loan payments to a fixed amount—even though no federal program guarantees the permanent reductions that Defendants promise. Then, Defendants claim that these federal programs require the payment of significant advance fees when in fact they are free. Additionally, Defendants represent that they will collect consumers' monthly loan payments and apply them towards consumers' loans, but instead, Defendants simply pocket the money. To prevent their victims from discovering this scam, Defendants cut them off from their loan servicers and ED by telling consumers to stop all communication with these entities. Defendants sometimes even deceive consumers into believing that Defendants will be their new loan servicer. Defendants' practices violate the Federal Trade Commission Act ("FTC Act") and the FTC's Telemarketing Sales Rule ("TSR").

Unsurprisingly, hundreds of consumers nationwide have complained about Defendants to the Better Business Bureau ("BBB"), FTC, Consumer Financial Protection Bureau, state attorneys general, and other government agencies. Consumers consistently report the same deceptive practices alleged by the FTC in this case. But rather than change their practices in response to these complaints, Defendants instead have changed their name. After the BBB alerted consumers to a pattern of complaints referencing one of Defendants' fictitious business names, Defendants persisted with the same deceptive practices under a new business name. In fact, over the last three years, Defendants have operated under at least three different names, and their scheme is ongoing.

Along with this Memorandum, the FTC is submitting overwhelming evidence of Defendants' fraud. This evidence includes, among other things: the transcripts of two undercover calls by a government investigator that capture Defendants' misrepresentations; twenty declarations from consumers victimized by Defendants; a declaration from a servicer of federal loans that has received dozens of complaints about Defendants and has identified almost 1,900 unique borrowers

potentially impacted by Defendants' scheme; a declaration from the BBB about complaints it has received about Defendants and the warning letters it has sent to Defendants that have been ignored; and a sample of consumer complaints about Defendants filed with the BBB or government agencies.

To protect consumers from additional harm and preserve assets for eventual restitution to victims, the FTC asks this Court to issue an *ex parte* temporary restraining order ("TRO") that freezes Defendants' assets and appoints a temporary receiver over the corporate defendants.

## I. Defendants' Deceptive Business Practices

Defendants capitalize on the financial hardship many student loan borrowers are experiencing by targeting them with a fraudulent debt relief scheme that misrepresents how consumers can participate in federal loan repayment programs. ED offers income-driven repayment ("IDR") programs that allow eligible borrowers to limit their monthly payments to a percentage of their discretionary monthly income. Consumers can apply for and enroll in IDR programs through ED or their student loan servicers at no cost.[2] As detailed below, Defendants misrepresent the existence of an affiliation with ED, promise impossible loan repayment benefits, and mischaracterize IDR programs to convince consumers to pay them substantial fees to participate in free government programs.

### A. False Claims of Affiliation with ED

Defendants' scam begins with unsolicited, and often illegal[3] telemarketing calls to consumers who have federal student loans. Upon reaching consumers, Defendants promptly gain their trust by falsely claiming to be "affiliated with," to "work directly with," to "work on behalf of," or to work "in conjunction with"

---

[2] *See* https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven

[3] Defendants routinely initiate telemarketing calls to telephone numbers on the National Do Not Call Registry in violation of the FTC's Telemarketing Sales Rule. *See infra* at p. 19.

ED.[4] To further this misrepresentation, Defendants use email addresses in communicating with consumers that end in ".us" rather than ".com."[5] During calls with consumers, Defendants frequently reference confidential details about consumers' loans, such as the loan amount or consumers' occupation, which consumers assume Defendants obtained as a result of their affiliation with ED.[6]

---

[4] *See, e.g.*, PX 23 at 539, ¶ 32, Att. S at 698 ("[w]e work directly with the Department of Education"); *id.* at 564, ¶ 80(a), Att. KK at 813 ("part of the Department of Education"), 814 ("affiliated with the Department of Education"), 817 ("repetitively told me they were a part of the Department of Education"), 820 ("called me under the guise of being a government agency"), 826 ("she works with the federal government"); PX 3 at 125, ¶6 ("was affiliated with [ED]" and "worked on behalf of the government to help students get debt relief"); PX 4 at 153, ¶ 2 ("worked with the government to alleviate debt"); PX 8 at 248, ¶ 2 ("affiliated with [ED]"); PX 9 at 274, ¶ 3 ("working on behalf of the government"); PX 10 at 290, ¶ 4 ("works closely with [ED]"); PX 14 at 377, ¶ 2 ("partner of [ED]"); PX 20 at 492, ¶ 2 ("represents [ED]"); PX 1 at 4, ¶ 10 (noting pattern of consumer complaints of Defendants claiming affiliation with ED).

[5] *See, e.g.*, PX 3, Att. A at 133 ("enrollment@sdrg.us"). In at least one instance, Defendants listed the ED website at the end of an email, leading the consumer to believe they were affiliated with ED. PX 3 at 125, ¶ 4. At times, Defendants even claim to have sent emails that actually came from ED. To do this, while on the phone, Defendants tell consumers that they will send them an email momentarily. Defendants then go to ED's website and submit a "Forgot My Username" request for the consumers' loan account, which generates an email to the consumer from an ED email address ending in .gov. *See* PX 20 at 492-3, ¶ 5, Att. A at 498.

[6] *See, e.g.*, PX 18 at 461, ¶ 4 ("seemed to have all my loan information, which led me to believe they were acting on behalf of the federal government as a new servicer for my loans,") ¶ 7 (consumer had already applied on her own, telemarketer responded that "he knew this and that this was how he got my information."); PX 3 at 126, ¶ 6 ("I assumed that the only reason she had this information was because she was associated with [ED]"); PX 4 at 154, ¶ 4 ("affirmed my impression they were working with the federal government"); PX 7 at 206, ¶ 2 (contributed to the impression that the telemarketer "was either from or affiliated with" ED); PX 8 at 249, ¶ 5 ("he wouldn't have had this kind of personal information if he weren't affiliated with the government."); PX 15 at 380, ¶ 3 ("had access to information that I believed he wouldn't have had access to unless

Defendants also frequently claim the program they pitch was authorized by President Obama's "Student Loan Forgiveness Act," a proposal never signed into law.[7]

As a result of Defendants' misrepresentations, consumers often incorrectly believe that they are speaking to an affiliate of ED, not an unrelated private company with no ties to the government. This misimpression then colors all of the representations that follow and lends credibility to Defendants' other false claims.[8] In fact, many consumers only agree to turn over their sensitive personal information along with hundreds of dollars in fees because they believe Defendants are agents of the government.[9]

---

he were affiliated with [ED]"); PX 20 at 492, ¶ 2 ("assumed he knew these things because he represented [ED] and therefore had access" consumers' personal information).

[7] *See, e.g.*, PX 23 at 539, ¶ 32, Att. S at 675 ("Student Loan Forgiveness Act…by the Obama Administration"); PX 4 at 153, ¶ 2 ("Obama Relief" program); PX 9 at 274, ¶ 3 ("Obama had passed a bill relating to student loans"); PX 14 at 377, ¶ 2 ("partner of [ED]" that was "granted by [ED]" to administer new federal debt reduction law Obama passed); PX 15 at 380 ("affiliated with the government" and "worked on Obama's loan forgiveness program").

[8] *See, e.g.,* PX 3 at 126, ¶ 6 ("What helped alleviate my concerns…was my belief that SDRG worked for the federal government"); PX 7 at 206, ¶ 2 ("…the representative led me to believe that SDRG was a legitimate company because its supposed connection to the government"); PX 10 at 290, ¶ 4 ("I believed the company was legitimate because the representative kept saying StuDebt was with [ED]"); PX 15 at 380, ¶ 3 ("The representative…said SDRG was affiliated with the government….[t]hey sounded like a very legitimate company"); PX 16 at 412, ¶ 5 ("She led me to believe that SDRG was affiliated somehow with the government or [ED], and that this contributed to SDRG's ability to offer me such a good replayment program"); PX 20 at 492, ¶ 3 ("I was excited to receive a call from someone who I thought was working on behalf of [ED]").

[9] *See id. See also* PX 20 at 492, ¶ 4 (telemarketer claimed he had the consumer's information already, but just needed her to provide it again to confirm; consumer complied because she "thought [the telemarketer] was working with [ED].").

**B. False Claim of Fixed Monthly Loan Payments**

After deceiving consumers about who they are, Defendants misrepresent the relief consumers will obtain through ED programs. Typically, after asking consumers basic questions about their loans and income, Defendants tell consumers that they can enroll them in a government program that will permanently lower their monthly payments, often by hundreds of dollars. Defendants quote a specific monthly payment amount and represent that this amount will remain the same for 10 or 20 years, after which the remainder of the consumer's loan balance will be forgiven.[10] These claims are false.

No IDR program guarantees the same monthly payment for more than one year. Monthly payments are based on income and family size, which borrowers must recertify annually. Because income and family size are likely to fluctuate, it is impossible for Defendants to guarantee consumers a fixed monthly payment for more than one year, let alone ten or twenty. Moreover, as discussed below, the monthly payment figure Defendants quote frequently is not a loan payment at all, but rather a monthly fee that Defendants charge consumers without applying it to their outstanding loan balance.

More recently, Defendants appear to be making even more outrageous claims to some consumers, representing that if consumers pay a certain amount to

---

[10] *See, e.g.*, PX 23 at 537, ¶ 26, Att. P at 643 (quoting $114/mo.), 646 ("you'll pay a total of $27,360…you're going to receive total forgiveness in the amount of about $28,000"); PX 3 at 127, ¶ 11 (quoting $192/mo. for 10 years, rest forgiven); PX 12 at 304, ¶ 2 (quoting $199/mo. or less for 10 years, rest forgiven); PX 20 at 493, ¶ 6 (quoting $299.75/mo. for 120 payments, rest forgiven); PX 1 at 3, ¶ 7, Att. A at 11 (quoting $141.83/mo. for 120 months, rest forgiven), Att E. at 22 (quoting $176/mo., "will never change"), Att. T. at 62 (quoting $19 for 240 payments), Att. W at 68 (quoting $39/mo. for 240 months, rest forgiven), Att. DD at 82 (quoting $300/mo., balance forgiven in 20 years).

Defendants upfront, all or part of the rest of their loans will be forgiven.[11] There is no federal program under which this is possible.

### C. Illegal Advance Fees and Fraudulent Monthly Charges

Defendants collect two types of fees from consumers: (1) advance fees, which they falsely claim are required to participate in the government loan repayment programs, and (2) monthly fees, which they mislead consumers into believing are their new loan payments. Defendants' typically charge consumers an advance fee of between $398 and $1,047. They often call this fee an "enrollment," "application," or "processing" fee.[12] In some instances, consumers are led to believe that all or a portion of these advance payments will be applied to repay their loans.[13] Consumers believe that if they do not pay the advance fee, they will not be able to enroll in the federal IDR program and have their monthly loan

---

[11] *See, e.g.*, PX 1 at 5, ¶14, Att Z at 74 ("loan would be forgiven after 3 pymts of $350"), Att. FF at 86 ("company would forgive loan for pymt of $600), Att. HH at 90 ("make payments of $200 for 3 months and half of the loan would be forgiven").

[12] *See, e.g.*, PX 23 at 537, 539, ¶¶ 26, 32, Att. P at 649 ("enrollment fees"), Att. S at 681 ("three enrollment payments"); PX 3 at 128, ¶ 13 ("application fees"); PX 7 at 206, ¶ 4 (same); PX 8 at 248, ¶ 3 (first montly fee was for the application); PX 9 at 275, ¶ 9 (payment was "part of the enrollment process"); PX 10 at 291, ¶ 7 ("processing fee"); PX 14 at 378, ¶ 5, Att. A ("enrollment payments"); PX 18 at 462, ¶ 6 (fee required to enroll); PX 20 at 494, ¶ 7 ("initial fee of $1047…required" to enter the program).

[13] *See, e.g.*, PX 4 at 154, ¶ 5 ("thought that these payments were being applied to my student loan balance"); PX 5 at 161 ¶ 11 (based on sales call, "I believed that this $250 payment would be a payment toward my student loan"); PX 12 at 305 ¶ 5 ("assumed that the…payments were my new monthly payment, and would be applied" to loans); PX 15 at 381, ¶ 7 ("under the impression" the money would apply to loans); PX 17 at 444, ¶ 4 (was told Defendants would keep the money while processing application, but then "everything would be transferred to the servicer [thereafter]").

payments permanently reduced.[14] Trusting that the Defendants are affiliated with the government and that payment of the advance fee is necessary to participate in the program, consumers provide their payment information. Defendants typically charge consumers all or a portion of the advance fee almost immediately, long before consumers actually are enrolled in an IDR program.[15]

In addition to the advance fee, Defendants charge their most financially strapped consumers— typically those whose low discretionary income would at least qualify them initially for a $0 monthly payment—an additional monthly fee. Rather than acknowledge to these consumers that their new monthly payment will be $0 once they are admitted to the IDR program, Defendants tell them their monthly payment will be approximately $39 and that this amount will be applied each month to their outstanding loan balance.[16] Defendants then collect this $39

---

[14] *See, e.g.*, PX 1 at 4, ¶ 11 (noting pattern of borrower complaints that Defendants claimed fees were required to enroll in IDR plans); PX 3 at 128, ¶ 13 ("it was only after making these payments and getting approved that I could begin paying my new monthly rate"); PX 7 at 206, ¶ 4 ("if I did not pay the application fee, I could not get into the repayment program"); PX 9 at 275, ¶ 9 ("in order to get into the program . . . I needed to pay $299 each month for the first two months"); PX 12 at 304, ¶ 3 ("believed that the only way to enroll was by paying the one-time $199 fee"); PX 13 at 348, ¶ 4 (believed "I could not get into the repayment program without paying $600"); PX 16 at 412, ¶ 6 ("In order to get into the program, [Defendants] told me I had to pay an enrollment fee of $600"); PX 18 at 462, ¶ 6 ("told me that this fee was required in order to enroll"); PX 19 at 487, ¶ 2 ("I could have my student debt forgiven if I paid her company $299"); PX 20 at 494, ¶ 7 ("believe[d] I had to pay [the fee] to take advantage of the program").

[15] *See, e.g.*, PX 1 at 4, ¶ 11 (16 borrowers reported that Defendants collected or tried to collect a fee before providing any services), 5, ¶13 (borrower charged $600 to enroll in an IDR before she had graduated from school); PX 9 at 274, 277, ¶ 2, 15 ($299 and $19 charged on same day after telemarketing call); PX 18 at 461, 463, 465, ¶¶2, 13, 22 (consumer had already applied on own, but was charged $250).

[16] *See, e.g.*, PX 23 at 539, ¶32, Att. S at 678-79 (laid off with no income, but was quoted $39/mo.), 683 (told "the payment that you give us for your loan, it goes

every month but do not apply any of it toward consumers' loans. Many consumers pay for months before realizing that their $39 payments are not being applied toward their loans.[17] Consumers who realize Defendants are engaged in a scam and who block their accounts from being charged are threatened by Defendants with collections and adverse credit reporting.[18]

**D. Defendants' High-Pressure Tactics**

To induce consumers to sign up, Defendants create a sense of urgency by leading consumers to believe that their offer is available for only a limited time and that consumers must act now. For example, Defendants have told consumers that it is the "last opportunity" to enroll, a "limited-time offer," that consumers need to "lock in" their monthly payment amount now, or that the program will expire if the consumer does not enroll immediately.[19] Defendants use these misrepresentations

---

directly to the – to the Department of Education"); PX 10 at 291-3, ¶¶ 5, 12, 15, and Att. B at 301 (actual servicer statement notes she qualified for $0/mo., but Defendants told her monthly payment was $39/mo.); PX 13 at 348, ¶3 (unemployed student with no income was quoted $30/mo. payments); PX 15 at 380, ¶ 4 (student with part-time job for basic living expenses was quoted $39/mo.).

[17] *See, e.g.*, PX 10 at 293, ¶13 (charged $39/mo. for 22 months); PX 16 at 415, ¶15 (charged $39/mo. for almost a year); PX 4 at 154, ¶5 (charged $19/mo. for 9 months); PX 23 at 546, ¶ 54(d) (941 checks for $39 totaling $36,699 was deposited into just one of Defendants' bank accounts).

[18] *See, e.g.*, PX 23 at 565, ¶ 82, Att. KK at 832 ("they are still calling every day…threathning [sic] to send me account to collections and ruin my credit score"); PX 13 at 351, ¶ 16 (threatened collections and "derogatory remarks" to credit bureaus that will "negatively impact your credit score"); PX 7 at 211, ¶ 18 (text messages about "collections and negative credit"); PX 8 at 250, ¶ 8 (same); PX 17 at 445, ¶ 10 (same).

[19] *See, e.g.*, PX 5 at 159, ¶ 4; PX 13 at 348, ¶ 3 ("if I worked with him now, I could lock in that low monthly rate"); PX 14 at 377, ¶ 2 ("limited time offer…would expire if I did not take advantage of it now"); PX 18 at 462, ¶ 6 ("in order to qualify . . . I would need to make my decision over the phone and begin paying"); PX 20 at 493, ¶ 4 ("I did not really have time to stop and think about what I was doing," believed that "if I did not sign up immediately, I could lose my

and high-pressure tactics to convince reluctant consumers that they need to sign up right then. As a result, Defendants frequently are able to collect consumers' loan and payment information during the telemarketing call.[20]

After Defendants have convinced consumers to enroll in the program and have obtained their payment information, they rush consumers into digitally signing a lengthy and confusing "agreement." Defendants email consumers a link to an online portal that prominently displays a dialog box that requests consumers' electronic signature. Behind the large dialog box is the partially obscured document consumers are being asked to sign electronically.[21] Consumers are unable to move or close the dialog box before clicking to "e-sign" multiple pages.[22] Many consumers, trusting that Defendants are affiliated or working with the government, quickly "e-sign" the document without reading it.[23] Others are pressured and led to believe there is no reason to read the document before signing it.[24] One consumer, for example, tried to review the document while the

---

opportunity"); PX 23 at 539, ¶ 32, Att. S at 697 ("[t]here has been rumors that [Trump] is going to take these programs away").

[20] *See, e.g.*, PX 3 at 127-28, ¶13; PX 4 at 154, ¶ 4; PX 7 at 207, ¶ 5.

[21] PX 23 at 533-34, ¶¶ 14-17, Att. L at 602, Att. M at 603.

[22] PX 23 at 533-34, ¶¶ 14-17, Att. L at 602, Att. M at 603; *id.* at 540, ¶¶ 35-36, Att. U at 702-07.

[23] *See, e.g.*, PX 3 at 128, ¶¶ 14-15; PX 13 at 349, ¶ 9; PX 16 at 413, ¶ 9; PX 17 at 444, ¶ 6; PX 20 at 495, ¶ 10.

[24] *See, e.g.*, PX 8 at 249, ¶ 6 (wanted to look over document and talk to someone before signing, was told "I couldn't do this, and I had to e-sign it while he was on the phone" or they "wouldn't help me reduce my payments"); PX 10 at 292, ¶ 11 ("told me that I did not need to read it, as he had already gone through everything with me over the phone"); PX 16 at 413, ¶ 9 (did not read because was told "there was no reason to since she had already discussed with me everything that was in it"); PX 18 at 462, ¶¶ 6, 10 (no need to read because "contract simply restated the terms he had already discussed on the phone"); PX 7 at 208, ¶ 8 (it was just "customary paperwork to confirm what he had told me on the phone"); PX 20 at 494-95, ¶ 10 ("I had to sign," "I had to do this right away").

telemarketer insisted on staying on the phone and continued to pressure her to sign the document.[25] In some instances, consumers e-sign the document within one minute of receiving it.[26]

Even if consumers were provided an opportunity to review the "agreement," it contains statements that contradict many of Defendants' misrepresentations in the sales calls. Behind the dialog box, for example—and blocked from consumers' view—is a statement that Defendants are "not affiliated with the Department of Education,"[27] which is contrary to what consumers are told over the phone. Elsewhere, Defendants often have included statements in the "agreement" about the need to pay a $39 monthly fee for services that were never mentioned in the sales call and that are completely unrelated to consumers' student loans, including "Involuntary Unemployment Insurance," "RX Advantage Discount Prescription Drug Program," "Vision Care Program," or tax preparation.[28] In other words, Defendants tell consumers one thing during the sales call, and then pressure them to sign without reading a document that states something completely different. As

---

[25] *See, e.g.*, PX 19 at 488, ¶¶ 6-9 (telemarketer "insisted on staying on the phone" while consumer tried to review contract, applied so much pressure on consumer it triggered consumer's post-traumatic stress disorder). In another instance, a consumer was instructed to open the document and click on buttons without even being told that she was e-signing a contract. *See* PX 20 at 495, ¶10 ("I did not know, and the representative did not tell me, that clicking on the button would generate an electronic signature for me.").

[26] *See, e.g.*, PX 13 at 349-50, ¶¶ 9-10, Att. A at 353, Att. B at 354 (1 minute); PX 16 at 413, ¶ 9, Att. A at 419, Att. B at 420 (same). *See also* PX 12 at 305, ¶¶ 4-5, Att. A at 310, Att. B at 311 (4 minutes).

[27] PX 23 at 533, ¶¶ 14-17, Atts. L-N at 602-613.

[28] *See, e.g.*, PX 10, Att. A at 296; PX 16, Att. B at 426; PX 23 at 567, ¶ 90, Att. OO at 850; PX 15, Att. A at 397.

discussed below, these belated and contradictory statements do not cure the oral misrepresentations Defendants made just moments before.[29]

**E. Cutting Consumers Off from Servicers and the Department of Education and Falsely Claiming to be Consumers' Servicer**

Defendants take numerous steps to prevent consumers from discovering that they have been scammed. During the initial call and afterwards, Defendants require consumers to turn over highly sensitive information—including Social Security numbers, login IDs, passwords, and security questions and answers—that allow Defendants to access consumers' loan accounts on ED's website or consumers' loan servicers' websites.[30] Using this information, Defendants often log in to consumers' accounts and change their usernames, passwords, and security questions—thereby shutting consumers out of their own accounts.[31] Many consumers do not realize their accounts have been tampered with until they try to log in and discover that their credentials no longer work.[32]

---

[29] Defendants' websites also contain statements contradicting their oral misrepresentations. These websites, however, are irrelevant to the scheme, as they are not part of Defendants' sales pitch or written communications to consumers.

[30] *See, e.g.*, PX 23 at 539, ¶ 32, Att. S at 694 ("without your Social Security number, I can't enter the [ED] database, and I can't pull up your loans and we cannot move forward…"); PX 1 at ¶ 16 (Defendants requested login information from numerous borrowers); PX 14 at 377, ¶ 4 ("He said that he needed my login information to confirm my eligibility for the program"); PX 7 at 207, ¶ 5 ("I believed I had to provide that information or I would lose the opportunity to get into the program").

[31] *See, e.g.*, PX 5 at 159-60, ¶ 8 (login credentials changed); PX 6 at 204, ¶ 5 (address changed); PX 16 at 412, ¶ 7 (login and password changed). Defendants also appear to be changing consumers' account information with consumers' actual loan servicers. *See, e.g.*, PX 1 at 6, ¶¶ 15-18 (loan servicer reporting that almost 1900 borrowers had their account contact information changed to reflect Defendants' email address, mailing address, or phone number).

[32] *See, e.g.*, PX 5 at 163, ¶ 17 ("tried logging into my account at myfedloan.org, but I was unable to get in"); PX 16 at 412, ¶ 7 ("was unable to access my account").